GENERAL ELECTRIC CO. v. E. B. LATHAM & CO.

(Circuit Court, S. D. New York. July 23, 1907.)

No. 9,155.

PATENTS—ANTICIPATION—ELECTRICITY METERS.

The Duncan patent No. 550,823 for improvements in electricity meters of the motor type claims 1 and 8, the essential feature of which is a magnetic shield inserted between the armature and the damping magnets to protect them from the influence of the field coils, are void for anticipa-

tion and lack of patentable novelty in view of the prior art and publications.

In Equity. On final hearing.

Kerr, Page & Cooper (Thomas B. Kerr and Drury W. Cooper, of counsel), for complainant.

Seward Davis (Lynn A. Williams and Charles A. Brown, of counsel), for defendant.

HAZEL, District Judge. This is a patent suit for injunction and accounting based upon the alleged infringement of letters patent No. 550,823, to T. Duncan, dated December 3, 1895, for improvements in electricity meters. The patentee assigned the patent to the Siemens & Halske Electric Company, which subsequently assigned the same to the complainant corporation, which is the present owner thereof. The principal defenses are denial of patentability of the alleged invention and anticipation by the prior art. The patent relates to integrating watt meters of the motor type, which are used to measure the electric current flowing through the circuit to which they are connected. Improvements relating to the construction of the armature, commutator, and brushes are covered by the patent, but such improvements are not included in claims 1 and 8, which alone are involved in this cause. Such claims read as follows:

"1. In an electric meter, a magnetic medium or shield interposed between the drag or damping magnets and the field coils or other external fields or source of magnetism, adapted to receive the stray lines of magnetism from the said field coils or other external source, and thereby protect the said magnets from the effects of external magnetism, as and for the purpose described."

"8. In an electricity meter, the combination with a motor, and integrating or indicating mechanism, of a retarding device consisting of a movable aluminum or copper disk or cylinder, being cut in its motion by the magnetism of a plurality of magnets, having their field approaching a right angle to the axis of the external magnetic field, from which they are intended to be shielded, and an iron or other suitable protector of convenient form for shielding said magnets, as and for the purpose set forth."

As will be observed, the first claim relates to a magnetic shield inserted between the armature and the damping magnets. The eighth claim relates not only to the shield for protecting the damping magnets, but also covers such an arrangement of the latter as to have their "field approaching at right angle to the axis of the external magnetic field." The specification alluding to the feature of novelty of the quoted claims, says:

"Fourth, the method of preventing deterioration in strength of the magnets employed to produce the necessary brake force by shielding them from the influence of the field coils of the meter; fifth, the further elimination of the weakening of the drag magnets by setting them at right angles to the axis of the field coils."

The complainant claims, and it is not controverted, that in the use and operation of the series coils of the patent in suit there is created a variable magnetic field dependent in its variation upon the amperes or the amount of current flowing through them, and, further, that the rotatable armature, which is necessarily connected in shunt with the

primary circuit, also creates a magnetic field in its immediate locality controlled by the voltage or pressure of the current passing through it. The electricity meter in question is applicable to both alternating and direct current circuits, the different parts being mounted upon a metal ring-shaped frame. The field coils and rotatable armature are adjusted in parallel relation, and by their co-operation cause the rotation of the armature, its velocity being accelerated or retarded according to the current passing through the field coils. The dials of the meter are connected with a spindle or shaft bearing the rotatable armature by the revolutions of which a train of gears is actuated registering the current passing through the circuit. To correctly record the current utilized, a method of retarding the revolutions of the armature is necessary, as otherwise its speed would unduly increase, and the usefulness of the meter become jeopardized if not rendered wholly impracticable. The effect of a retarding device upon the armature is to proportionately increase or diminish its rotation as the current is consumed by the user. The prior art concededly disclosed watt meters, which employed a rotatable disk mounted upon an armature shaft between the jaws of the permanent magnets, which were of different configuration than the magnets in suit, and it is undeniable that by the prior methods of influencing the velocity of the armature interfering or so-called eddy or Foucault currents were generated in the disk which affected the accuracy of the meter and frequently caused it to run fast. Hence, the patentee sought to overcome all such retarding or weakening influences upon the drag magnets by the field coils of the meter, and also to protect such drag magnets from the demagnetization due to stray lines of current. As already indicated, to accomplish the object of the alleged invention the patentee provided a shield for the drag magnets to serve as a protection from the field coils and set the drag magnets at right angle to the field coils. The shield preferably consisted of an iron or steel hood, which partially surrounded the magnets and disk, but according to the specification the patentee did not limit himself as to its form. He positioned a cup-shaped shield between the drag magnets and the series coils, and so arranged the drag magnets as to cause their magnetic field to operate substantially at right angle to the magnetic field of the coils. He was not the first in this field of invention. Various patents for measuring the amount of electric current flowing through a circuit are found in the record. Was Duncan the first to conceive the idea of employing a shield or bar in the manner described in the specification? Did he solve a problem entitling him to the protection of the patent laws? It was old to screen or shield a mechanism which was apt to sustain injurious effects from stray lines of current. The art was familiar with the deterrent effects produced by a magnetic shield inserted between permanent magnets and a detrimental force. It may be presumed that claim 1 read in connection with the specification is for a combination of elements, although the single element emphasized therein was well known at the time it was conceived by the patentee. Its value as an invention, therefore, must depend entirely upon whether a new result was produced by its use in combination with a watt meter.

In the Giles patent reference is made to "a magnetic medium or

shield interposed between" the hair spring of a watch and "external fields or sources of magnetism." The Weston patent describes an instrument for measuring electricity, which includes the element of an iron plate surrounding a magnetic bar to shield the magnetic needle from exterior magnetic influences. The shield was interposed between the permanent magnet and "any field created by any means whatsoever other than that created by the permanent magnets." In the British patent to Crompton & Kapp, No. 4,453 of 1883, is found a magnetic shield inserted between a permanent demagnetized bar of steel to protect the same from external fields or sources of magnetism. Complainant contends that these applications relate to a different art. Nevertheless, I am of opinion that the use of the shield found in the publications mentioned was analogous to the use by complainant. This court is not unmindful of the rule that a simple change or alteration in a mechanism may oftentimes produce valuable results not before known; and, where the prior art discloses a defective mechanism, invention unquestionably may be involved by the adaptation of a practical method. Yet, assuming there were inaccuracies of measurement by prior watt meters due to eddy currents, the effect of such currents was well understood by the skilled in the art and were guarded against by the use of protecting shields. In such circumstances it is thought questionable whether the adaptation by the patentee of the protecting shield in question was patentable. But this court does not decide the submitted question of invention on that ground. Claim 1 is thought to be anticipated by the British patent to Teague of 1891. That patent was an integrating watt meter, and was correctly regarded at the hearing by both sides as the defendant's best reference. The patentee, after stating in the specification the manner in which the magnetic needle should be mounted upon the revolving spindle of the meter, says:

"Between the needle and the mercury trough, magnets, or other disturbing portion of the apparatus is interposed a magnetic screen f, adapted to screen the needle from stray lines of force, and formed with a small hole in the center through which the spindle b will pass freely. The screen f is shown as flat, and supported on small brass pillars, but it may be dished or made funnel-shaped to drain back any mercury displaced from its trough. The cover of the case a is of some suitable nonmagnetic material, and to the outside of the case is mechanically secured a frame g, which contains a suitably arranged train of wheels or integrating gear (not shown), actuated from a suitably mounted rotatable spindle h, and to this second spindle h is attached an outer magnetic needle i or a piece or pieces of soft iron. The latter needle or iron is mounted as close to the inner needle as possible, so that when the latter rotates by the actuating devices of the meter the outer needle is also rotated by magnetic induction only, acting through the case without any mechanical connection."

The location of the magnetic shield is not dissimilar to the location specified in claim 1. It is not enough to assert that the Teague device was a different style of meter, that it relates to a mercury meter, or that the patentee merely intended to remove disturbances affecting the magnetic needle as distinguished from harmful effects upon the drag magnets. The particular object of the screen f, as heretofore observed, was to shield the magnetic needle from stray lines of force. This likewise was the object of claim 1 in suit based upon the principle disclosed

by the Teague patent.    Hence, such claim is anticipated by the Teague patent.

The eighth claim is specifically descriptive of the Duncan watt meter in the light of the fourth and fifth feature of the specification for protecting the permanent magnets.    In approaching the consideration of this claim, I conceive the principal question to be whether the prior art disclosed a "plurality of magnets having their field approaching at right angle to the axis of the external field from which they are intended to be shielded."    Upon this point the complainant's witness Ackerman, speaking of the Duncan meter, says:

"The lines of magnetic force from the fields cut the armature in a direction at right angles to the windings and that the direction of the lines of force of the permanent magnets, being from pole to pole, are at right angles to those of the field coils."

This version is also in harmony with the view of defendant's expert witness.    The patentee asserts that in meters wherein the field coils and magnets were parallel to each other the stray flux interferes with the drag or braking magnets, and therefore the meter inaccurately registers the current flowing through it.    Assuming that if claim 8 were unanticipated by the prior art a patentable improvement would be apparent, yet at the date of the invention in suit it was not new to arrange the drag magnets and the field coils in an angular relation, as will be observed by an examination of the prior publications hereinafter mentioned.

In the patent to Elihu Thompson, No. 432,654, the arrangement of the parts is such as to create a magnetic flux at right angles to the axis of the field coils.    That the patent relates to a type of meter of an oscillating structure and not to a rotating armature is not thought important.    In the Thompson patent, No. 448,894, is shown an integrating meter with a rotating armature mounted between the field coils, the armature being mounted upon a spindle which also bears a commutator and a counting train.    The specification shows a retarding device in the form of a rotatable disk positioned below the armature and field coils while the poles of the permanent magnets embrace said disk, the resultant of the angular arrangement being that the field of the magnets is perpendicular to the axis of the field coils.    In the patent to Scheefer, No. 530,351, which is a close reference, is shown an angular arrangement together with the axis of the field coils perpendicular to the permanent magnets and the flux in the air gaps. Complainant insists inter alia that in the Scheefer patent there is no magnetic shield, that the windings of the field coils are around an iron core, and also that the so-called perpendicular lines are those which stray out from the sides of the core and not from the magnetic field induced by the field coils.    The testimony of the expert witnesses upon the latter point is widely discrepant and difficult to harmonize, but the testimony of the defendant is thought to fairly indicate that by the Scheefer arrangement of the field coils and the drag magnets, as indicated by the explanatory figures 2, 3, and 4 of the illustrative drawings found in defendant's brief, the drag magnets are at right angle to the axis of the field coils and the flux in the air gap is likewise at right angle to the field coils.

Without deeming it necessary to discuss the question raised by the defendant that claim 8 is for an aggregation and not for a combination, or to answer the arguments in opposition to the claim of anticipation, I have concluded on the whole record that said claim contains no patentable novelty. The principle of both claims, in my opinion, is disclosed in the prior art.

The bill lacks equity, and is therefore dismissed, with costs.